NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0356n.06

No. 19-3896

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Aug 25, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| LOUIS J. AKRAWI, | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW FROM |
| v. | ) | THE BOARD OF IMMIGRATION |
| | ) | APPEALS |
| MERRICK B. GARLAND, Attorney General, | ) | |
| Respondent. | ) | OPINION |
| | ) | |

Before: BATCHELDER, WHITE, and BUSH, Circuit Judges.

BATCHELDER, J., delivered the opinion of the court in which BUSH, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 17–23), delivered a separate opinion dissenting in part.

**ALICE M. BATCHELDER, Circuit Judge**. Petitioner Louis Akrawi, a native of Iraq, petitions for review of the dismissal of his appeal by the Board of Immigration Appeals, in which he challenged the Immigration Judge's denial of his application for deferral of removal under the Convention Against Torture. Akrawi argues that he has established that it is more likely than not that he will be tortured upon his arrival in Iraq, that the Board of Immigration Appeals committed legal error by denying him relief, and further, that it abused its discretion by denying his motion to remand to consider new evidence. We disagree and DENY his petition for review.

**I.**

**A. Akrawi is Ordered to be Removed to Iraq**

In 1965, Louis Akrawi, an Iraqi Christian and political oppositionist, fled to the United States from Iraq. In 1969, he was admitted to the United States as a refugee. But Akrawi abused

his good fortune. In 1979 and 1981, the State of Michigan convicted Akrawi of malicious destruction of property and attempted aggravated assault. In 1989, because of his criminal convictions, the Immigration and Naturalization Service ("INS") initiated removal proceedings against him.

However, Akrawi was not removed, nor was he done with his life of crime. In 1996, the State of Michigan convicted Akrawi again, this time for second-degree murder, conspiracy to commit assault, assault, and possession of a firearm in the commission of a felony. Akrawi was sentenced and sent to state prison in Michigan, with an expected early release date of February 28, 2011. Consequently, the Immigration Judge ("IJ") closed Akrawi's removal proceedings.

Fast forward to 2008. As Akrawi's expected early release date drew nearer, the INS sought to reopen his case, add more removal charges for his 1996 convictions, and reinitiate removal proceedings. The IJ obliged and reopened Akrawi's case. At the subsequent hearings, Akrawi, without the assistance of counsel, announced that he would not seek deferral of removal, acknowledged that he wanted the IJ to order his removal, and waived his right to appeal. On March 24, 2009, the IJ ordered Akrawi to be removed to Iraq.

**B. Akrawi Seeks Deferral of Removal under the Convention Against Torture**

Akrawi was eventually released from prison in 2017 and shortly thereafter, the Department of Homeland Security detained him. Akrawi, this time assisted by counsel, filed an emergency motion to reopen removal proceedings based on changed country conditions in Iraq. Akrawi sought deferral of removal under the Convention Against Torture ("CAT"). The IJ granted Akrawi's motion and set the matter for an individual hearing. The IJ held hearings on the merits of Akrawi's claim on April 2, 2018, and June 21, 2018.

Akrawi, in support of his application, submitted documentary evidence that included several U.S. State Department reports, three expert witness declarations, articles on changed country conditions in Iraq, and news media articles about Akrawi. The government also submitted documentary evidence, which included three expert witness declarations, reports from the U.S. State Department on human rights and religious freedom, and articles reporting on Christians returning to Iraq.

The government objected to the declarations of two of Akrawi's expert witnesses—Rebecca Heller and Daniel Smith.[1] The IJ did not qualify those witnesses as experts because they did not establish sufficient expertise, but he did admit their declarations as those of fact witnesses because of their unique and valuable perspectives on Iraq. Akrawi did not object to the government's expert witness declarations.

Akrawi called four witnesses to testify: Kalude Shamoun (Akrawi's niece); Victor Manuel Akrawi (Akrawi's son); Scott Matthew Burnstein, a journalist who had known Akrawi for a couple of years before the hearing; and Tharir Chaka Kalasho (Akrawi's nephew). Akrawi himself also testified.

Akrawi, assisted by counsel, provided extensive testimony at the hearing. He claimed that "President Bush Jr." was head of the CIA in 1965 and that "he signed" Saddam Hussein to join the CIA that same year. Akrawi said that he himself was part of the faction of the Communist party that opposed Hussein's regime in the 1960s, and that the Hussein regime wanted to kill him because he opposed the regime. For this reason, he fled the country and eventually arrived in the United States. Akrawi claimed that members of the Hussein regime who tried to kill him in the 1960s still retain control over the Ba'ath party and that they have retained some political power

---

[1] The government did not object to the expert witness declaration of Akrawi's third witness, Mark Lattimer.

over certain areas in Iraq. Akrawi further testified that two unnamed contacts told him that it was unsafe for him to return to Iraq. He also maintained that the current Iraqi government, with the support of the United States, does not accept American deportees like himself because the Iranian militia, led by a one-eyed general named Sadr, controls the Iraqi government.

On cross-examination, when pressed by government's counsel on why he did not include in his application his fear that old Iraqi communists and Ba'athists wanted to harm him, Akrawi told government's counsel to ask Akrawi's lawyer. Akrawi refused to name his contacts who told him that it was unsafe for him to return to Iraq. And when he was asked for additional evidence that communists in today's Iraq still pose a threat to former colleagues such as Akrawi, he told the government's counsel to ask the FBI and CIA about it. Akrawi did not offer additional proof of his claim that old political enemies wanted him dead or that they have retained positions of political power in Iraq. He also did not offer additional evidence, other than his own testimony, that Hussein-loyalists are retaliating against Hussein's old political enemies in Iraq.

### C. The IJ Denies Akrawi's Application

On November 27, 2018, the IJ denied Akrawi's application for deferral of removal under the CAT. The IJ deemed all the witnesses credible, but accorded less weight to the testimonies of Akrawi, Akrawi's son, and Akrawi's nephew because of their uncorroborated claims and because the documentary evidence contradicted their testimony. The IJ also found that Akrawi's testimony lacked candor because he refused to answer questions on cross-examination and because his claims lacked "any documentary or rational support."

Next, the IJ moved to the merits of Akrawi's application. For several reasons, the IJ concluded that Akrawi failed to establish that it is more likely than not that he will be tortured by or at the behest of the Iraqi government.

The IJ first examined the likelihood of torture because of Akrawi's political history and opinions. The IJ concluded that the record lacked evidence that the Iraqi Communist or Ba'ath parties have retained political power in the Iraqi government. On the contrary, the IJ found the weight of evidence supported the opposite conclusion. Similarly, the IJ did not find sufficient evidence that the Iraqi government would acquiesce in his being tortured or ignore the threat of torture upon his return. Further undermining the likelihood of torture, the IJ noted that one of Akrawi's contacts travels to and from Iraq regularly without suffering harm or torture. The IJ recognized too that the political histories of many candidates for Iraq Prime Minister resembled Akrawi's political history, and that their similar political histories neither prevented them from seeking election to the office of Prime Minister nor caused them to be tortured.

The IJ then analyzed the likelihood of torture because of Akrawi's religion, westernization, and lack of identification documents. The IJ concluded that Akrawi failed to carry his burden for several reasons. First, while the Iraqi militias have committed violence against Christians and westernized Iraqis, those instances were too isolated to show it was more likely than not that they will torture Akrawi. Second, the IJ noted the evidence that the Iraqi government has dedicated resources to defeating these militias, which cuts against the likelihood that it will acquiesce to the torture of Akrawi. The IJ agreed with the government's experts that while lack of identification documents may cause questioning, it is not likely to cause torture at government checkpoints. The IJ also agreed with the government's experts that Akrawi's western and American style will not likely cause him to be tortured because western influences "are neither unwelcome nor uncommon in Iraq."

For all the foregoing reasons, the IJ denied his application for deferral of removal under the CAT.

### D. The Board of Immigration Appeals Dismisses Akrawi's Appeal

Akrawi appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). Akrawi also filed on appeal—"in the nature of a motion to remand"—additional evidence of changed country conditions in Iraq. The BIA denied both Akrawi's appeal and his motion to remand, and affirmed the IJ's conclusion that Akrawi is not likely to suffer torture. The BIA rejected Akrawi's argument that the IJ erred by failing to apply Sixth Circuit precedent, *Yousif v. Lynch*, 796 F.3d 622 (6th Cir. 2015), because *Yousif*'s holding does not provide an automatic entitlement to relief for "every future Chaldean Christian," such as Akrawi. The BIA also noted that *Yousif* does not make it any more likely that *any* Chaldean Christian will face torture in Iraq. The BIA found no error in the IJ's crediting of the government experts' testimony because their conclusions relied on first-hand knowledge, updated research, and corroboration with other country reports. The BIA further found no merit in Akrawi's argument that the IJ decided his case on arbitrary and inconsistent grounds. The BIA also concluded that all the purportedly similar cases that Akrawi relied on were distinguishable from Akrawi's case.

The BIA then turned to the new evidence that Akrawi submitted in support of his motion to remand and denied the motion because the new evidence did not show "a remarkable shift from the reports examined by the immigration judge." However, one board member dissented from the BIA's denial because "the rapidly changing conditions in Iraq make a remand more appropriate than is typically the case." The dissenting board member would have remanded to the IJ to reassess the new evidence of Iraq's country conditions.

Akrawi petitions this court for review of the BIA's decision. As Akrawi's petition was pending, the Supreme Court handed down its decision in *Nasrallah v. Barr*, 140 S. Ct. 1683 (2020).

We allowed, and the litigants filed, supplemental briefing in light of *Nasrallah*.[2] We now review

Akrawi's petition on the merits.

## II. Analysis

To obtain a deferral of removal under the CAT, the petitioner must "establish that it is more

likely than not that he or she would be tortured if removed to the proposed country of removal."

8 C.F.R. § 1208.16(c)(2); *see id.* § 1208.17(a). The implementing regulations define "torture" as:

> Any act by which severe pain or suffering, whether physical or mental, is
> intentionally inflicted on a person . . . when such pain or suffering is inflicted by,
> or at the instigation of, or with the consent or acquiescence of, a public official or
> other person acting in an official capacity . . . .

8 C.F.R. § 1208.18(a)(1).

In assessing whether a petitioner has met the burden of proof required, the agency considers

"all evidence relevant to the possibility of future torture," which includes:

> (i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the
> applicant could relocate to a part of the country of removal where he or she is not
> likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human
> rights within the country of removal, where applicable; and (iv) Other relevant
> information regarding conditions in the country of removal.

8 C.F.R. § 1208.16(c)(3). An application for relief under the CAT has a more stringent burden of

proof than a claim for asylum. *See Hassan v. Gonzales*, 403 F.3d 429, 435 (6th Cir. 2005).

In support of his petition for review, Akrawi makes several arguments. We find none of

them persuasive.

---

[2] We now have jurisdiction to review all of Akrawi's challenges to the CAT order that denied him relief, whether those be factual, legal, or constitutional challenges. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020).

## A. Factual Challenges

We review the BIA's decision "as the final agency determination." *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013) (quotation omitted). To the extent that the BIA adopts the IJ's reasoning, we review the IJ's decision too. *Id.* Whether Akrawi has shown that it is more likely than not that he will be tortured upon removal to Iraq is a question of fact that we review under the "highly deferential" substantial-evidence standard. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020) (review of non-citizen's factual challenges to CAT orders is under the highly deferential substantial-evidence standard); *see also Kilic v. Barr*, 965 F.3d 469, 473 (6th Cir. 2020). Under this standard, we reverse "only if the evidence compels a different result." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008); *Kilic*, 965 F.3d at 473 (the IJ's factual findings stand "unless any reasonable adjudicator would be compelled" to conclude to the contrary (quoting *Nasrallah*, 140 S. Ct. at 1692)).

Akrawi argues that the evidence presented to the IJ compels the conclusion that he is more likely than not to suffer torture in Iraq. His argument relies on several facts in the record: (1) that he is a Chaldean Christian with strong ties to the United States; (2) that he has a criminal record; (3) the notoriety of a planned mass removal of Iraqis from the United States to Iraq; and (4) his inability to obtain Iraqi identification documentation.

Akrawi cannot prevail on this argument because the evidence presented in the record was mixed: some evidence supported a likelihood of torture while other evidence cut against a likelihood of torture. A record with mixed evidence cannot compel a reversal of the BIA's decision because "when the evidence could reasonably point in either direction, . . . we must defer to the [BIA's] choice." *Shafo v. Wilkinson*, 844 F. App'x 791, 796 (6th Cir. 2021). In other words, a record with mixed evidence precludes relief under the substantial-evidence standard.

Here, the evidence was mixed because substantial evidence in the record supported the IJ's denial of Akrawi's CAT application. Consider whether there is a likelihood that Akrawi will suffer torture because he is a Chaldean Christian with strong ties to the United States. One of the government's experts, Dr. Denise Natali, submitted evidence that many Christians have safely returned to Iraq and that they even celebrated mass for the first time in many years. Another of the government's experts, Dr. Michael Rubin, concluded that religious minorities, including Christians, do not have reason to fear harm upon their return to Iraq. Still another of the government's experts, Douglas Ollivant, concluded that westernized Iraqi Christians have "little concern" of harm, and that "Christians of Iraqi origin who are returned to their country are at low risk of torture o[r] persecution, whether at the hands of the government or non-government actors."

Akrawi disagrees, pointing to evidence that supports a contrary factual finding. For example, he cites his fact witness, Daniel Smith, who declared that Christians and other religious people face systematic sectarian violence in Iraq. He also relies on his expert witness, Mark Lattimer, who declared that individuals with ties to the United States are targeted for violence and torture. Akrawi further points to his second fact witness, Rebecca Heller, who declared that Iraqis with ties to the United States "face heightened risks within Iraq on the basis of their perceived loyalty to the United States."

While Akrawi's evidence supports his desired factual finding, it does not compel a reversal; substantial evidence supported the IJ's factual finding. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that evidence not only *supports* that conclusion, but *compels* it . . . ."). That the IJ found the government's evidence more persuasive than Akrawi's evidence is not legal error. Where there is mixed evidence, the substantial-evidence

standard does not permit us to second-guess the IJ's decision. *See Shafo*, 844 F. App'x at 796. Thus, we must decline Akrawi's invitation to do so here.

Akrawi's other factual challenges suffer from the same defect. In support of his petition for review, Akrawi points us to his criminal record, the notoriety of mass removal of Iraqis from the United States to Iraq, and his lack of identification documents. But the government submitted substantial evidence that these facts do not make it more likely than not that Akrawi will be tortured in Iraq. For example, Dr. Natali found it "farfetched" and "not born out by any reliable evidence" that the Iraqi government would harm, or even detain, returnees from the United States based on their having criminal records. Mr. Ollivant agreed, stating that he knows of no evidence that suggests a returnee, either with a criminal record or without Iraqi identification documents, would face a high likelihood of torture. That the IJ was persuaded by the government's evidence to deny Akrawi's application—and was not persuaded by Akrawi's evidence to grant it—does not compel a reversal. Akrawi may not agree with the IJ's factual findings, but the substantial-evidence standard requires Akrawi to show more than a mere disagreement; rather, he must show compelling evidence to the contrary, which he has failed to do here. *See Marqus v. Barr*, 968 F.3d 583, 588–89 (6th Cir. 2020) (declining to "reweigh the evidence" and rejecting the factual challenges of the petitioner, a Chaldean Christian Iraqi, despite our decision in *Yousif*); *Solaka v. Wilkinson*, 844 F. App'x 797, 799 (6th Cir. 2021) (same).[3]

---

[3] In his supplemental reply brief, Akrawi argues that the IJ failed to rely on 2016 U.S. State Department reports and that these reports compel relief that requires a reversal. But Akrawi forfeited this argument because he raised it for the first time in his reply brief. *See Hernandez-Perez v. Whitaker*, 911 F.3d 305, 310 (6th Cir. 2018). And even if Akrawi did not forfeit this argument, he still cannot prevail because the 2016 reports were part of a record that "include[d] profoundly mixed evidence," which cannot compel relief under the substantial-evidence standard. *See Shafo*, 844 F. App'x at 796 (quotation marks omitted).

## B. Other Challenges

Akrawi raises several other arguments, but we find none persuasive. First, Akrawi argues that the BIA failed to follow controlling Sixth Circuit precedent in *Yousif v. Lynch*, 796 F.3d 622, 628 (6th Cir. 2015). According to Akrawi, *Yousif* established a categorical entitlement to a deferral of removal to Iraq for any Chaldean Christian. Therefore, Akrawi asserts that he is entitled to relief under the CAT simply because he is a Chaldean Christian.

Recent Sixth Circuit precedent has foreclosed this argument. In *Marqus*, 968 F.3d at 588, we held that *Yousif* did not "establish an entitlement to withholding for all time for all Chaldean Christian Iraqis." *Id.* (quotation omitted). Hence, Akrawi's status as a Chaldean Christian does not entitle him to an automatic deferral of removal and his argument to the contrary is without merit. *See also Abdulahad v. Barr*, 838 F. App'x 126, 134 (6th Cir. 2020) (finding that *Yousif* did not establish a "categorical approach" that entitled Chaldean Christians to a withholding of removal).

Akrawi next argues that the BIA acted arbitrarily "by not treating identical cases the same." Akrawi points to several of the BIA's decisions, and argues that they involved facts and claims "nearly identical" to his, but they resulted in "disparate outcomes." At the very least, Akrawi argues, the BIA should have explained why it did not treat his case like it treated the others.

This argument fails for three reasons. First, the BIA was not bound to follow the BIA's decisions that Akrawi cites because they were unreported decisions. *See Jomaa v. United States*, 940 F.3d 291, 298 (6th Cir. 2019) (holding that the BIA "accords no precedential value to its unreported decisions" (quotation omitted)); *Abdulahad*, 838 F. App'x at 134.

Second, even if the cases had precedential value, the BIA adequately explained why it distinguished Akrawi's case from the other cases that Akrawi cited. "An agency decision is

arbitrary and capricious if the agency fails to examine relevant evidence or articulate a satisfactory explanation for the decision." *Jomaa*, 940 F.3d at 296 (quotation omitted). Here, the BIA explained that Akrawi's case was "factually, legally, and procedurally distinguishable from all of the cases that he has attached." The BIA further explained that only one of the cases reached an ultimate outcome on the proceedings, and for that one case, a different IJ made the final decision. The BIA's decision was neither arbitrary nor capricious.

Third, Akrawi submitted these cases in an appeal to the BIA, not in his application before the IJ. Cases not submitted before the IJ "cannot constitute a basis for reversing the IJ's decision." *Abdulahad*, 838 F. App'x at 134 (quoting *Ishac v. Barr*, 775 F. App'x 782, 789 (6th Cir. 2019) (finding that cases submitted to the BIA on a motion to remand cannot be the basis for reversing the IJ's decision on the grounds that the IJ acted in an arbitrary manner)). Therefore, neither the IJ nor the BIA acted arbitrarily in denying Akrawi relief.

Akrawi next argues that the BIA erred by failing to treat two U.S. State Department 2017 reports as highly probative evidence. According to Akrawi, this constitutes legal error because the 2017 reports provided information that compels granting him relief under the CAT. But this argument fails because the 2017 reports were not before the IJ as evidence so they "cannot constitute a basis for reversing the IJ's decision." *Ishac*, 775 F. App'x at 789 (quotation omitted). While these reports are relevant to the BIA's denial of his motion to remand to consider new evidence, they do not help Akrawi's petition to the extent that it asks us to reverse the IJ's decision.

Akrawi argues in his supplemental reply brief that the IJ denied his due process rights because it failed to recognize two of his witnesses as experts. But Akrawi did not make this argument in his appeal to the BIA, his initial brief before this Court, or in his supplemental brief. Petitioners forfeit arguments that they raise for the first time in a reply brief. *See Gafurova*

*v. Whitaker*, 911 F.3d 321, 327 n.2 (6th Cir. 2018); *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 310 (6th Cir. 2018). Therefore, Akrawi has forfeited this argument in support of his petition for review.

Even if Akrawi did not forfeit this argument, he still cannot prevail. "[W]e review evidentiary rulings by IJs only to determine whether such rulings have resulted in a violation of due process." *Singh v. Ashcroft*, 398 F.3d 396, 407 (6th Cir. 2005). Here, Akrawi argues that the IJ erred by denying expert status to two of his witnesses while giving "sole weight to all the government's experts." But this is inaccurate. To be sure, the IJ did accord more weight to the government's witnesses, but not "sole weight." Rather, the IJ granted percipient status to Akrawi's witnesses because he found that their experience and qualifications (*i.e.*, leading a non-governmental organization, supervising law students, and photography and journalism in Iraq) did not qualify them as experts on Iraq's country conditions. But the IJ did not exclude their testimony; he just found it less authoritative than that of the government's witnesses and explained his reasons for this finding. Credibility determinations such as these do not violate a petitioner's right to due process. *See Francis v. Barr*, 781 F. App'x 495, 500 (6th Cir. 2019); *Al-Koorwi v. Barr*, 837 F. App'x 323, 331–32 (6th Cir. 2020) (finding no due process violation where the IJ granted percipient status to the petitioner's witnesses rather than excluding them altogether).

### C. Motion to Remand

Finally, Akrawi challenges the BIA's denial of his motion to remand to consider new evidence. Akrawi submitted new evidence before the BIA, which included the U.S. State Department's 2017 Human Rights Report, the U.S. State Department's 2017 Religious Freedom Report, and an article by Michael Rubin on Muqtada al-Sadr and his political influence. Akrawi

argues that the BIA abused its discretion because it neither reviewed the new evidence nor adequately explained why it denied his motion to remand. This argument is without merit.

We review the BIA's denial of Akrawi's motion to remand for an abuse of discretion. *Marqus*, 968 F.3d at 592. The BIA abuses its discretion if its denial was made "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination." *Ahmed v. Mukasey*, 519 F.3d 579, 585 (6th Cir. 2008) (quotation omitted). To properly exercise its discretion, the BIA must consider the petitioner's proffered evidence and "articulate" the basis for its decision. *Marqus*, 968 F.3d at 592. If the BIA determines that the petitioner's evidence does not support a remand, it must provide an explanation why sufficient "to allow for meaningful review by an appellate court." *Id.* (quotation omitted); *Scorteanu v. I.N.S.*, 339 F.3d 407, 412 (6th Cir. 2003) (the BIA must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted" (quotation omitted)). Here, the BIA explained why the new evidence did not support a remand:

> While these more recent reports continue to reflect that Christians in Iraq may be facing harassment, abuse, and other harm in Iraq, these reports do not denote a remarkable shift from the reports examined by the Immigration Judge. Therefore, [Akrawi] has not demonstrated worsening country conditions or circumstances since the time of his hearing, nor has he demonstrated that conditions have materially worsened for anti-Saddam activists, Chaldean Christians, or Westernized individuals since his last hearing . . . . Therefore, the new documentation submitted by [Akrawi] has not demonstrated a material change in country conditions and a remand is not warranted in this instance.

In denying Akrawi's petition, the BIA provided a reasoned, sufficient, and succinct basis for denying Akrawi's motion: the new evidence was largely similar to the evidence already considered. *See Abdulahad*, 838 F. App'x at 135 (finding no abuse of discretion because the BIA found the new evidence was "cumulative" of the evidence already considered by the IJ);

-14-

*Suate-Orellana v. Barr*, 979 F.3d 1056, 1063 (5th Cir. 2020) (finding no abuse of discretion because the BIA found the new evidence was similar to the evidence previously considered). Thus, the BIA did not abuse its discretion by refusing to remand Akrawi's case.

The BIA's explanation here is also distinguishable from the main case that Akrawi cites in support of his argument—*Marqus v. Barr*. In *Marqus*, the BIA abused its discretion by denying the petitioner's motion to remand because it neither named the new evidence nor articulated why the new evidence was insufficient. 968 F.3d at 593. By contrast, here, the BIA named the 2017 reports and explained that the reports did not show a "remarkable shift" in the threat of harm that Christians face in Iraq as compared to previous reports. Hence, the BIA's lack of explanation in *Marqus* is distinguishable from the BIA's explanation here.

In any event, a review of the U.S. State Department's 2017 reports does not undermine the rationality of the BIA's reason for denying remand. While the 2017 reports did show that Chaldean Christians still face persecution and harm in Iraq, the reports did not suggest an escalation in persecution and harm materially different from what previous U.S. State Department reports reflected. For example, Akrawi asserts that the 2017 reports showed a "resurgence of ISIS forces" that will result in a "continued genocide of Chaldean Christians." But the reports do not indicate such an ISIS resurgence. On the contrary, the State Department's 2017 Religious Freedom Report recognized that ISIS posed a "continued" threat:

- "ISIS *continued* to commit individual and mass killings";

- "ISIS also *continued* to engage in harassment, intimidation, robbery, and destruction of property and religious site";

- "ISIS *continued* to target all religious minorities who refused convert to Islam or who opposed the terrorist group."

What is more, in that same 2017 Religious Freedom Report, the State Department reported that the Iraqi government announced that "all territories were finally liberated from ISIS control." The report also noted that the "St. Gorgis Chaldean Catholic Church rededicated its church in the town of Telskof," which "ISIS had looted and burned" when it occupied the town several years ago. The 2017 Human Rights Report indicated the same: "By year's end Iraqi Security Forces . . . had liberated all territory from ISIS, drastically reducing ISIS's ability to commit abuses and atrocities."

While the 2017 reports recognized that ISIS continues to be a threat to Christians in Iraq, they nonetheless support the BIA's conclusion that the reports do not show a material change in that threat. Indeed, the reports portray the country conditions as remaining largely unchanged. *See Bi Feng Liu v. Holder*, 560 F.3d 485, 491–92 (6th Cir. 2009) (finding that the country report failed to show changed conditions because the report portrayed conditions as "relatively constant"). In fact, a fair reading of the 2017 reports suggests that Iraqi Christians have benefited from the Iraqi government's success in pushing ISIS out of all the territories that it once occupied. Accordingly, the BIA did not err by denying Akrawi's motion to remand.

**III.**

For these reasons, we deny the petition for review.

**HELENE N. WHITE, Circuit Judge,** dissenting from sections II.A. and II.C. Because Akrawi has adequately established that he is more likely than not to suffer torture in Iraq, and the BIA abused its discretion in denying Akrawi's motion to remand on the basis of new evidence, I respectfully dissent.

**I.**

We review whether Akrawi has shown a likelihood of torture in Iraq "under the highly deferential substantial-evidence test, meaning those findings stand unless any reasonable adjudicator would be compelled to disagree." *Marqus v Barr*, 968 F.3d 583, 588 (6th Cir. 2020) (citations omitted). Specifically, we ask whether "the cumulative probability of torture by all of the [relevant] entities [in Iraq], or for all the reasons, exceeds 50%." *Id.* at 589 (citations omitted).

The record before the IJ compels the conclusion that the Iraqi government will likely imprison and torture Akrawi because of his prior criminal activity in both the United States and Iraq. This is particularly likely given that he has no family in Iraq or documentation to help identify him while detained. Akrawi was convicted of murder in the United States, and the IJ found that he participated in an attempt to assassinate Saddam Hussein in Iraq in the 1960's. That makes him a criminal in both countries. Additionally, he has no Iraqi identifying documentation, and no family in Iraq to vouch for him once detained.

My colleagues, pointing to two conclusory quotes from government experts Denise Natali and Douglas Ollivant stating that detainees with criminal records will likely not face torture in Iraq, argue that these quotes are "substantial evidence" that Akrawi, specifically, will not face torture. However, the overwhelming weight of the evidence submitted to the IJ—the 2016 Human Rights report, as well as testimony from both Akrawi and the government's experts—shows that Akrawi's specific circumstances will likely result in him being detained and tortured upon arrival.

First, government expert Michael Rubin stated that while "[d]eportees returning to Baghdad International Airport are likely to be questioned to ascertain who they are, who their family is, and the circumstances by which they left Iraq," detention is unlikely "should the returnee be able to show family connections." However, "Ba'athists, military deserters, and those suspected of having committed serious criminal offenses *inside Iraq*, like murder and rape, would likely be detained." *Id.* at 1983–85. Additionally, government expert Ollivant noted that Iraqi detainees will "certainly be subject to screening," and the Iraqi government will "have a responsibility, given the criminal records of some of the returnees, to ensure that the returnees do not present a danger to Iraqi society." *Id.* at 1992–96. Ollivant also testified that "some returnees will not have Iraqi identification documents, so will be held in government custody until these documents can be produced." *Id.* at 1993. Thus, according to the government's experts, Akrawi will "certainly" be subject to detention, screening, and investigation by the Iraqi government, particularly given the fact that he committed a crime "inside Iraq" and that he has no "documents" or "family connections" to show.

Next, the 2016 Human Rights Report, submitted to the IJ, repeatedly references government-sponsored abuse in detention facilities, with widespread and credible reports of torture. *See, e.g., id.* at 1271 ("Although the constitution expressly prohibits torture in all its forms under all circumstances, including cruel, inhuman, or degrading treatment, government officials as well as local and international human rights organizations documented instances of government agents committing torture and other abuses," and "[p]olice throughout the country continued to use abusive and coerced confessions as methods of investigation, and courts continued to accept forced confessions as evidence"); 1272–73 ("As in previous years, abuse and torture occurred during arrest, pretrial detention, and after conviction"); 1273 ("International human rights

organizations documented credible cases of torture and abuse in facilities of the Ministry of Interior and to a lesser extent in detention facilities of the Ministries of Justice and Defense, as well as in facilities of the KRG"). Thus, according to the 2016 Human Rights Report, torture is commonly used in Iraqi detentions as part of the investigative criminal process.

The 2016 Human Rights Report evidence is corroborated by Akrawi's expert Daniel Smith—whom the IJ permitted to testify as a percipient witness[1]—who stated, based on interviews and first-hand accounts, that torture is systematic in Iraqi detentions because "Iraq relies on a confession-based approach to investigation, interrogation, and separately, to prosecution." *Id.* at 773 (noting that Smith has "personally witnessed this practice" and that it "had been described to [him] by multiple commanders, officials, officers, and guards from over ten components of Iraqi security forces (including the Interior Ministry [police], National Police, the 54th and 56th Army Brigades, and Military Intelligence), Justice Ministry officials and personnel (including two Justice Minsters and three prison guards with whom [he has had] continued contact), multiple non-security Iraqi officials," and others).

Finally, Akrawi's expert Mark Lattimer stated that detainees' difficulty living anonymously in Iraq is "further exacerbated by media coverage publicizing the returns and emphasizing the criminal history of returnees, including references to sexual crimes and drug trafficking. This makes the entire class of potential returnees subjects of interest" to the militias interested in prosecuting "morality crimes." *Id.* at 738–39.

A quick internet search of Akrawi's name reveals that his criminal reputation precedes him. Multiple online articles refer to him as a crime "kingpin" or the "Godfather of the Chaldean Mafia"

---

[1] Percipient, or "lay" witnesses, may not provide opinion testimony but may "testify based on personal experience and perception." *Matter of J-G-T-*, 28 I&N Dec. 97, 101 (BIA 2020) (quoting *Matter of Y-S-L-C-*, 26 U&N Dec. 688, 690 (BIA 2015)).

in Michigan—*see* George Hunter, *'Godfather of Chaldean Mafia' among deportation targets*, The Detroit News (June 22, 2017), https://www.detroitnews.com/story/news/local/wayne-county/2017/06/22/chaldean-mafia-godfather-deportation-target/103092364/; John Wisely *et al*, *Iraqi detainee, ex-drug kingpin Louis Akrawi ends hunger strike, agrees to liquid diet*, The Detroit Free Press (July 13, 2017) https://www.freep.com/story/news/local/michigan/2017/07/13/iraqi-louis-akrawi-hunger-strike/476401001/—and he is even referenced in the Wikipedia page for "Chaldean Mafia." Wikipedia, *Chaldean Mafia*, https://en.wikipedia.org/wiki/Chaldean_Mafia (last visited July 22, 2022).

Neither the IJ nor the BIA addressed the impact of Akrawi's assassination attempt on Saddam Hussein when determining Akrawi's likelihood of torture on the basis of his criminal history, although Akrawi preserved the issue for review. Nor did the government substantially address it before us. *See* Respondent's Supp. Br. at 18 (noting only that Dr. Natali's "expert opinion is substantial evidence supporting [the IJ's] finding that [] Akrawi failed to show it more likely than not he will be tortured by the government, or with government acquiescence, due to his criminal history, westernization, or Christianity"). But the evidence before the BIA and IJ compels the conclusion that Akrawi is likely to be detained and investigated as a result of his extensive and notorious criminal history in Iraq and abroad, likely to have this detention prolonged due to his lack of family and Iraqi documents, and likely to be tortured during interrogation in line with Iraq's common investigative processes. Accordingly, I would find that the BIA erred in concluding that Akrawi's probability of torture upon removal did not "exceed[] 50%." *Marqus*, 968 F.3d at 589.

## II.

I would also find that the BIA abused its discretion in denying Akrawi's motion to remand so that the IJ could consider the 2017 Human Rights Report, the 2017 Religious Freedom Report,

and government-expert Rubin's article regarding Muqtada al-Sadr that contradicted his prior testimony before the IJ. The BIA abuses its discretion if its denial was made "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination." *Ahmed v. Mukasey*, 519 F.3d 579, 585 (6th Cir. 2008) (quotation omitted).

Akrawi argues that he provided multiple examples to the BIA showing how Iraq country conditions worsened for Chaldean Christians and westernized Iraqi citizens after his hearings before the IJ. For example, Akrawi argues that Rubin—the *government's* expert on whose testimony the IJ partially relied in concluding that western influences were not unwelcome in Iraq—wrote a May 2018 article speculating that Muqtada al-Sadr, new leader of the Iraqi Party as of May 2018, should not be trusted by American allies. Akrawi additionally argues that the 2017 Department of State Reports undermine much of the evidence relied upon by the government and IJ because "[o]ne of the central premises of the government's claims in 2018 was that the genocide of Iraqi Christians/Chaldeans would cease because of the military['s] territorial defeat of ISIS in December 2017," but "[t]he U.S. State Department 2017 Iraq Human Rights Report and 2017 International Religious Freedom Report make clear that the genocide continues." Petitioner's Br. at 33.

The BIA responded as follows:

> The respondent has also presented the more recent 2017 International Religious Freedom Report for Iraq, the more recent 2017 Human Rights Report for Iraq, and an article about Muqtada al-Sadr's political relevance, claiming that these documents demonstrate changed country conditions sufficient to compel a remand for consideration of these changes. The Immigration Judge considered the country conditions documentation that was submitted into evidence by both parties. While these more recent reports continue to reflect that Christians in Iraq may be facing harassment, abuse, and other harm in Iraq, these reports do not denote a remarkable negative shift from the reports examined by the Immigration Judge. Therefore, the

respondent has not demonstrated worsening country conditions or circumstances since the time of his hearing, nor has he demonstrated that conditions have materially worsened for anti-Saddam activists, Chaldean Christians, or Westernized individuals since his last hearing. Therefore, the new documentation submitted by the respondent has not demonstrated a material change in country conditions and a remand is not warranted in this instance.

AR 6 (internal record citations omitted). In a rare dissent, one member of the BIA objected to the majority's dismissal of Akrawi's new evidence:

I respectfully dissent from the majority's decision to affirm the [IJ]'s denial of deferral of removal protection under the Convention Against Torture relying on the outdated country conditions and background information in the record, and further concluding that the new documentation submitted on appeal did not demonstrate a material change in country conditions in Iraq such that a remand is warranted.

In my view, the rapidly changing conditions in Iraq make a remand more appropriate than is typically the case. Moreover, the recent country conditions reports and background information submitted on appeal do appear to suggest increasing harassment and abuse of Christians, particularly in the Christian-majority Ninewa plain. Accordingly, at a minimum, I would remand for reassessment of the issues upon consideration of the new evidence that the respondent has submitted as any deterioration of country conditions in Iraq should be evaluated by the fact-finder in the first instance. *See, e.g.*, *Shabo v. Sessions*, 892 F.3d 237, 241 (6th Cir. 2018) (holding that the probability of future torture is a factual determination).

*Id.* at 7 (internal record citations omitted).

My colleagues conclude that the BIA majority's explanation, though "succinct," was "reasoned" and "sufficient" because "the BIA named the 2017 reports and explained that the reports did not show a 'remarkable shift' in the threat of harm that Christians face in Iraq as compared to previous reports." My colleagues then perform the work that the BIA failed to do: sifting through the 2017 reports and explaining, with specific references to the record, why the reports do not support Akrawi's position. Had the BIA explained itself as well as my colleagues, this would be a closer case. But it did not, and that failure to explain is crucial because it is impossible to tell what the BIA majority found unpersuasive and, as the BIA dissent observed, the

evidence arguably demonstrated a material change in country conditions. *See* AR 7; *Marqus*, 968 F.3d at 592–93 (considering this identical issue in a published case—whether the 2017 reports presented a material change from the 2016 reports with respect to Iraqi country conditions for a prospective Chaldean Christian deportee—and noting that "[w]hile it is not our place to" analyze the evidence anew, the BIA erred in issuing a cursory denial when our own analysis of the reports suggested the changes "could be material").

Additionally, neither the BIA, nor my colleagues, addressed Akrawi's other piece of updated evidence: government-expert Rubin's 2018 article about Muqtada al-Sadr and his political influence. Nor did the BIA address Akrawi's arguments that Rubin's opinion on pro-American perception in Iraq shifted after the May 2018 election of Muqtada al-Sadr, and that the western-educated Prime Minster—relied upon by the IJ for the proposition that western influences were prevalent in Iraq—was voted out of office in the same election. Instead, the BIA noted only that Akrawi "has [not] demonstrated that conditions have materially worsened for . . . Westernized individuals since his last hearing." AR 6. As with the BIA's cursory explanation regarding updated country conditions for Chaldean Christians, this rationale impermissibly fails to "analyze and explain the basis on which it decide[d] against" Akrawi. *Marqus*, 968 F.3d at 592; *Ahmed v. Mukasey*, 519 F.3d 579, 586–87 (6th Cir. 2008) (concluding that the BIA abused its discretion in denying a motion to remand when it "neither acknowledged [new] evidence nor addressed its implications in terms of [the petitioner]'s contentions").

Accordingly, I would remand for the BIA to explain its reasoning for denying Akrawi's motion to remand on the basis of new evidence.